1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,                    No.  1:18-cr-00002-NONE-SKO

12                 Plaintiff,

13          v.                                      ORDER GRANTING IN PART AND
                                                    DENYING IN PART DEFENDANT
14    ISRAEL ALBERTO RIVAS GOMEZ and                CASTRO'S MOTION TO SUPPRESS
      JOHN DOE aka "Marcos Castro,"                 STATEMENTS MADE DURING HIS
15                                                  INTERROGATION; DENYING MOTION
                 Defendants.                        FOR AN EVIDENTIARY HEARING; AND
16                                                  DENYING MOTION TO STRIKE
                                                    GOVERNMENT DECLARATIONS
17
                                                    **UNREDACTED VERSION FILED**
18
                                                    **UNDER SEAL** (Doc. Nos. 119, 166, 167)
19

20          On June 2, 20220 counsel for defendant John Doe aka "Marcos Castro" filed an omnibus

21    motion under seal presenting at least eight separate motions over the course of its 572 pages

22    including supporting exhibits.  (Doc. No. 119.)  On July 10 and 17, 2020, the government filed an

23    opposition to defendant Castro's omnibus motion.  (Doc. Nos. 138, 154.)  On August 5, 2020,

24    defendant Castro filed a reply under seal.  (Doc. No. 164.)  On September 22, 2020, defendants

25    Rivas Gomez and Marcos Castro jointly filed a motion seeking an evidentiary hearing in

26    connection with their motions to suppress evidence.  (Doc. No. 166.)  On September 23, 2020,

27    defendant Castro moved to strike declarations filed by the government in its opposition to his

28    omnibus motion.  (Doc. No. 167.)  On September 30, 2020, the government filed its opposition to

                                              1

1  the defendants' joint motion for an evidentiary hearing.  (Doc. No. 173.)

2         Argument was heard by the court on all of the defendants' pretrial motions on October 1

3  and 15, 2020.  Assistant United States Attorneys Kathleen Servatius and Ross Pearson appeared

4  on behalf of the government at those hearings.  Federal Defender Heather Williams and Assistant

5  Federal Defender Erin Snider appeared for defendant Rivas Gomez.  Attorney Kevin Little

6  appeared for defendant Marcos Castro.

7         Following the October 2020 hearings, the court requested supplemental briefing

8  addressing specific issues related to defendant Castro's motion to suppress.  (Doc. No. 185.)  The

9  parties filed simultaneous supplemental briefs on February 22, 2021.  (Doc. Nos. 194, 195.)

10  Further oral argument was heard on February 26, 2021, with Assistant United States Attorneys

11  Kathleen Servatius and Ross Pearson appearing on behalf of the government; attorney Kevin

12  Little appearing for defendant Marcos Castro; and Federal Defender Heather Williams appearing

13  for defendant Rivas Gomez.

14         The nature of this criminal prosecution has been summarized in the court's prior orders

15  and need not be repeated here.  The various categories of motions brought by defendant Castro by

16  way of his omnibus motion have been addressed in separate orders.  This order will be limited to

17  addressing only defendant Castro's motion to suppress his statements made during his

18  interrogation by law enforcement officers, his request for an evidentiary hearing in that regard,

19  and his motion to strike the declarations submitted by the government in opposition to his motion

20  to suppress his statements.

21  I.     APPLICABLE LEGAL STANDARDS

22         The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal

23  case to be a witness against himself[.]"  U.S. Const. amend. V.  The Supreme Court has

24  "recognized that custodial interrogations, by their very nature, generate 'compelling pressures

25  which work to undermine the individuals will to resist and to compel him to speak where he

26  would not otherwise do so freely.'"  *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting

27  *Miranda v. Arizona*, 384 U.S. 436, 467 (1966)).  "To combat this inherent compulsion, and

28  thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on

the police an obligation to follow certain procedures in their dealings with the accused." *Moran*, 475 U.S. at 420*; see also Dickerson v. United States*, 530 U.S. 428, 435 (2000); *United States v. IMM*, 747 F.3d 754, 764 (9th Cir. 2014). Specifically, the Supreme Court has held the Constitution requires that a person questioned by law enforcement officers after being "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444); *see also IMM*, 747 F.3d at 764. "An officer's obligation to administer *Miranda* warnings attaches . . . only where there has been such a restriction on a person's freedom as to render him in custody." *Stansbury*, 511 U.S. at 322 (internal quotation marks omitted) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). The Supreme Court has also explained that:

> The prophylactic *Miranda* warnings are not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected. Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably conve[y] to [a suspect] his rights as required by *Miranda*.

*Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (internal citations and quotations omitted).

"For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's 'waiver of *Miranda* rights must be voluntary, knowing, and intelligent.'" *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (quoting *United States v. Binder*, 769 F.2d 595, 599 (9th Cir. 1985)); *see also United States v. Shi*, 525 F.3d 709, 727 (9th Cir. 2008). "A valid waiver of *Miranda* rights depends upon the 'totality of the circumstances including the background, experience, and conduct of defendant.'" *Shi*, 525 F.3d at 727 (quoting *Garibay*, 143 F.3d at 536). "To satisfy this burden, the prosecution must introduce sufficient evidence to establish that under the 'totality of the circumstances,' the defendant was aware of 'the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Garibay*, 143 F.3d at 536–37 (quoting *Moran*, 475 U.S. at 421); *see also United States v. Younger*, 398 F.3d 1179, 1185 (9th Cir. 2005). Moreover, there is a

1   presumption against the waiver of *Miranda* rights and a heavy burden of showing a valid waiver

2   by a preponderance of the evidence is on the prosecution.  *Colorado v. Connelly*, 479 U.S. 157,

3   168 (1986); *United States v. Bernard S.*, 795 F.2d 749, 752 (9th Cir. 1986); *Shi*, 525 F.3d at 727–

4   28; *see also Garibay*, 143 F.3d at 537 ("The government's burden to make such a showing 'is

5   great,' and the court will 'indulge every reasonable presumption against waiver of fundamental

6   constitutional rights.'") (quoting *United States v. Heldt*, 745 F.2d 1275, 1277 (9th

7   Cir. 1984).  Courts are to consider the following factors in determining whether a defendant

8   "knowingly and intelligently waived [her] constitutional rights":

> (1) whether the defendant signed a written waiver; (2) whether the defendant was advised of his rights in his native tongue; (3) whether the defendant appeared to understand his rights; (4) whether a defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system.

13   *Garibay*, 143 F.3d at 538 (internal citations omitted); *see also United States v. Crews*, 502 F.3d

14   1130, 1140 (9th Cir. 2007).

15       Below the court will first address defendant's motion to strike the declarations submitted

16   by the government in opposition to his motion to suppress his interrogation statements before

17   turning to the specific grounds upon which he seeks suppression of those statements.

18   **II.  MOTION TO STRIKE GOVERNMENT'S DECLARATIONS**

19       As an initial matter, defendant Castro moves to strike the declarations of FBI Agent Ryan

20   Demmon, Homeland Security Investigations (HSI) Agent Timothy Kotman, Immigration and

21   Customs Enforcement Deportation Officer (DO) Monique Jacques, DO Sellenia Romero, FBI

22   Task Force Officer (TFO) Mark Diedrich, and Sheriff's Detective Jose Mora.  (Doc. No. 167.)

23   He argues that the government failed to provide discovery pertaining to these declarations, which

24   could possibly be used by him to impeachment the declarants.  (*Id.* at 1.)  The government argues

25   that it was not obligated to produce impeachment evidence with respect to the declarant

26   government officers, assuming any such evidence were to exist, since no evidentiary hearing has

27   been scheduled in connection with the pending motion to suppress defendant's statements.  (Doc.

28   No. 171 at 1.)

"[B]ecause *Giglio* material 'merely goes to the credibility of the witness, it need not be disclosed prior to the witness testifying.'" *United States v. Welton*, No. cr-09-00153-MMM, 2009 WL 2390848, at *7 (C.D. Cal. Aug. 1, 2009) (citing *United States v. Rinn*, 586 F.2d 113, 119 (9th Cir. 1978); *United States v. Hopkins*, Cr. No. S-05-0538-EJG-GGH, 2008 WL 4453583, *2 (E.D. Cal. Oct. 3, 2008); *United States v. Marquez*, 686 F. Supp. 1354, 1358 (N.D. Ill. 1988) ("Because evidence which is potentially impeaching merely goes to a witness's credibility, courts generally hold that disclosure in advance of trial is not required"); *United States v. Laurins*, 660 F. Supp. 1579, 1584 (N.D. Cal. 1987)).

Defendant Castro cites several cases to support his argument that the "duty to provide exculpatory evidence extends to declarations offered by the government, who may be impeached in accordance with FRE 806." (Doc. No. 167 at 3.) The court has reviewed the cited decisions and finds that they do not support defendant Castro's motion to strike because they are either distinguishable from the present situation or are not aligned with defendant's contention. *See United States v. Triumph Capital Grp.*, 544 F.3d 149, 161–62, 164 (2d Cir. 2008) (involving disclosure of favorable proffer session notes after trial); *United States v. Jackson*, 345 F.3d 59, 71 (2d Cir. 2003) (involving disclosure of exculpatory and impeachment materials concerning a testifying trial witness or hearsay declarant); *United States v. Shyne,* 617 F.3d 103, 107–08 (2d Cir. 2010) (affirming the district court's order denying defendant's application for production of comprehensive proffer notes of non-testifying declarants); *United States v. King*, 73 F.3d 1564, 1571 (11th Cir. 1996) (addressing a situation in which a non-testifying co-defendant's statements were admitted into evidence under F.R.E. 801(d)(2)(E)); *United States v. Wali*, 860 F.2d 588, 591 (3d Cir. 1988) (involving admission of exculpatory statements from a co-conspirator for purposes of impeachment under Rule 806). Because the cases relied upon by defendant do not support his argument, the court will deny his motion to strike the declarations offered by the government in opposition to the pending motions.

### IV.    MOTION TO SUPPRESS HIS INTERROGATION STATEMENTS

Defendant Castro moves to suppress statements made by him during his interrogations by law enforcement agents on December 19, 2017, December 21, 2017, and December 26, 2017, as

well as any evidence obtained based on those statements.  He does so on the grounds that:  (1) on December 19, 2017 he was provided confusing and potentially conflicting advisements regarding his right to have counsel appointed on his behalf in connection with his interrogation; (2) on December 21, 2017, (a) he initially inquired about his right to counsel, but interrogating detectives responded to his inquiry in misleading and inappropriate ways, and (b) after he later clearly invoked his right to counsel, his interrogation continued; and (3) he was not promptly taken before a magistrate judge of this court for arraignment during the time of his interrogation. As noted above, defendant Castro seeks an evidentiary hearing in connection with his motion to suppress.  Below the court will summarize the facts surrounding defendant's claims, while noting where those facts are disputed.  The court will then address the merits of the various aspects of defendant Castro's pending motion to suppress his statements.

A.    **Factual Background**

The facts relevant to resolution of the pending motions are as follows.[1]

---

[1]  These facts are derived from the parties' briefs (Doc. Nos. 119, 138, 154), the exhibits attached thereto; the sworn declarations of FBI Agent Ryan Demmon, HSI Agent Timothy Kotman, current HSI Agent and then-DO Monique Jacques, ICE DO Sellenia Romero, and FBI TFO Mark Diedrich (Doc. Nos. 138-6, 138-7, 138-8, 138-9, 138-10); and translated transcripts of defendant's interviews (Doc. No. 119 at Ex. 3).  The court has also reviewed video recordings of each of the interrogations at issue in the instant motion.  Defendant has not submitted any declarations in support of his motion to suppress his statements.  The court will deny his motion to strike the declarations submitted by the government (Doc. No. 167) for the reasons discussed above.

10.)  DO Jacques took defendant Castro directly to Fresno County Sheriff Headquarters where they arrived at approximately 3:30 p.m.[2]  (*Id.*)

It is disputed by the parties exactly what occurred next.  Defendant Castro's counsel argues that DO Jacques provided Castro with a Notice to Appear, a notice of detention, and advised him of his administrative rights on December 19, 2017, at the time of his immigration arrest.  (Doc. No. 119 at 4.)  Defendant's counsel argues that DO Jacques informed Castro at that time that he may be represented by an attorney at no expense to the government in connection with his immigration proceedings.  (Doc. No. 119 at 4–5.)  In support of this assertion, however, defendant Castro submits only one piece of evidence:  a Notice to Appear and a Notice of Custody Determination, from which the signatures of defendant Castro are absent and in which certificates of service by the serving deportation officers are blank and unsigned.[3]  (*Id.* at 41–45.)

In contrast, the government contends that DO Jacques did not advise defendant Castro at the time of his immigration arrest on December 19, 2017, of his immigration-related right to an attorney and, as a result, Castro was not informed at that time that he was not entitled to a *free* attorney with respect to immigration matters.  (Doc. Nos. 154 at 11–13; 173 at 3.)  Specifically, in her declaration DO Jacques states under penalty of perjury as follows:

> 2. On December 19, 2017, HSI Special Agent Timothy Kotman and I were conducting surveillance at an apartment complex in Mendota, California, where Marcos Castro was believed to reside.  The purpose of the surveillance was so we could locate Castro and take him into custody for being illegally present in the United States.
>
> 3.   At approximately 2:40 p.m., I saw an individual matching Castro's description approaching the door of his apartment. SA

---

[2]  The government points out in its briefing that the Notice to Appear incorrectly stated that DO Jacques read defendant Castro his administrative rights at the Fresno ERO Office, an acronym referring to ICE Headquarters in Fresno.  (Doc. No. 154 at 10 (citing Doc. No. 119 at 48).)  The government has clarified that DO Jacques actually took Castro directly to Fresno Sheriff Headquarters on December 19, 2017.  (*See id.* (citing Doc. No. 138-8 ¶ 4).)

[3]  Defendant Castro has also submitted an excerpt of a video recording showing DO Jacques exiting the Fresno County Sheriff's Office interview room on December 19, 2017 as Detective Maldonado and Detective Mora enter.  (Castro's Lodged Ex. 2.)  Nothing depicted in this video establishes, or even suggests for that matter, that DO Jacques informed defendant Castro of his right to be represented by counsel at no expense to the government at that time.  (*See generally id.*)

7

Kotman and I approached the individual, later identified as Castro, and asked to speak with him. I identified myself as an immigration officer and asked Castro questions regarding his immigration status. Castro said that he did not have valid documents, that he was in the United States illegally, and that he had entered the United States illegally and was a citizen of El Salvador. SA Kotman and I then took him into custody. We took Castro directly to Fresno County Sheriff's Office located in downtown Fresno so he could be interviewed by homicide detectives.

4. We arrived at the Fresno County Sheriff's Office at approximately 3:30 p.m. and placed Castro in an interview room. While we were waiting for the detectives to arrive, I provided Castro with a summary of his administrative rights, as discussed in further detail below. In Form I-213, I incorrectly stated that I notified Castro of his administrative rights "[w]hile at the Fresno ERO office."

5. I did not read Castro his rights off of Form I-826, entitled "Aviso de Derechos y Notificaciones." *See* Castro Ex. 1, p. 5. I did not have Form I-826 ("Aviso de Derechos y Notificaciones") with me when I arrested Castro. If I had read Form I-826 ("Aviso de Derechos y Notificaciones") to Castro, I would have instructed him to initial, sign, and date the form, and I would have also signed and dated the form as well. As such, I am positive that I did not read this form to him, because neither Castro nor I signed Form I-826 on December 19, 2017.

6. I did not read Form I-862, the "Notice to Appear," to Castro either or serve him with a copy of this form. See Castro Ex. 1, pp. 1–2. I did not have Form I-862 ("Notice to Appear") with me when I arrested Castro. If I had read Form I-862 ("Notice to Appear") to Castro, I would have instructed him to initial, sign, and date the form, and I would have also signed and dated the form as well. As such, I am positive that I did not read this form to him, because neither Castro nor I signed Form I-862 on December 19, 2017.

7. The blank forms that Castro filed as Exhibit 1 to his Motion are from Castro's Alien file, or "A File." When deportation officers prepare to arrest a suspected illegal alien, it is common for us to prepare the documents for the A File prior to arrest in order to generate an Alien Number (commonly referred to as an "A number") for the suspected illegal alien and so the documents are ready to serve on the suspected illegal alien upon his return to the ICE office. It is not my practice to bring any documents from the A File with me when I arrest suspected illegal aliens. In fact, in my ten years as a deportation has officer I was instructed to never bring the A File to the field with me.

8. Rather, I typically only bring a field interview card, which is a form that contains spaces to collect biographical information from the suspected illegal alien. Exhibit 1, page 11, to Castro's Motion, which I have reviewed, is a true and correct copy of the field interview card that I had with me and filled in based on information Castro gave me while we were waiting for detectives at the Fresno County Sheriff's Office.

9.   The rest of the forms from the A-File—including Form I-826 ("Aviso de Derechos y Notificaciones") and Form I-862 ("Notice to Appear")—remain at the ICE office to serve on the alien when he is fingerprinted and booked into the ICE system at the office. I planned to serve these forms on Castro on December 19, 2017, when we returned to the ICE office.

10.   Accordingly, when I wrote in the narrative section of Form I-213 that I advised Castro of his "administrative rights," I did not mean that I read Castro Form I-826 ("Aviso de Derechos y Notificaciones") or Form I-862 ("Notice to Appear"). What I meant was that I gave Castro a summary of his options in immigration proceedings. I do not recall what, precisely, I said to Castro about his options. However, I likely told him what I tell all suspected illegal aliens who have not been previously ordered deported when I arrest them in the field: that he was not going to get deported that day, that he could see an immigration judge if he wished, that he could speak with his consulate, and that we would explain his full rights to him when we took him to ICE headquarters.

11. While in the field, it is not my normal practice to advise detainees regarding their right to an immigration attorney unless asked. I do not recall whether Castro asked me about his right to an attorney. Nor do I recall whether I advised Castro of this right. However, if a detainee asks me about their right to an attorney while I am in the field, I tell them that I will give them a list of free legal services. Detainees often state that they are unable to pay for an attorney. Whenever a detainee states this to me, I tell them that they will be provided with a list of free legal services. I never state that they will have to pay for an attorney on their own.

(Doc. No. 138-8 at 1-3.) [4]

The government asserts that at the time of defendant Castro's arrest, Special Agent Kotman and DO Jacques were unaware that he had personally participated in a kidnapping the night before which eventually resulted in the charges in this case being brought against him. (Doc. Nos. 138 at 10; 154 at 10 (citing Doc. No. 138-7 ¶ 6).)

/////

---

[4]  The government asserts that DO Jacques's statements are corroborated by the fact that the I-826 form was left blank (Doc. No. 154 at 12 n.3), whereas defendant Castro's counsel argues that the mere existence of the form strongly suggest that DO Jacques read the administrative advisements to Castro at the time of his arrest on December 19, 2017 (Doc. No. 119 at 4, 42).

9

1         At 4:11 p.m. on December 19, 2017, approximately 90 minutes after defendant Castro's

2  immigration arrest, Detective Adam Maldonado and Detective Jose Mora began questioning him

3  at the Fresno County Sheriff's Office.  (*See* Doc. Nos. 119 at 5, 56; 154 at 14.)  The detectives

4  first asked Castro a number of background questions such as his name, age, address and covered

5  other preliminary matters, which defendant estimates may have gone on for thirty minutes but

6  covers only 24 pages of a double-spaced transcript.  (Doc. Nos. 119 at 56-80.)  Defendant Castro

7  was then informed of his *Miranda* rights by the detectives and answered affirmatively when

8  asked if he understood each aspect of that advisement.[5]  (Doc. No. 119 at 80–81.)  That first

9  interview of defendant Castro lasted approximately 5.5 hours with a short meal break.[6]  (Doc.

10  Nos. 119 at 7 n.3; 154 at 14.)  At midnight on December 20, 2017, defendant Castro was arrested

11  by the detectives on state kidnapping and gang related charges.  (Doc. Nos. 119 at 12; 138-1 at 2;

12  138-2 at 1–2; 138-3 at 2; 154 at 14.)  A sheriff's deputy transported defendant Castro to the

13  Fresno County Jail and booked him at 3:46 a.m.  (Doc. No. 154 at 14 (citing Doc. Nos. 138-2 at

14  5; 138-3 at 2).)

15         On Thursday, December 21, 2017, around 4:00 p.m., Detective Mora and Detective

16  Maldonado interviewed defendant Castro again at the Fresno County Sheriff's Office.  (Doc. Nos.

17  119 at 341; 154 at 14.)  Detective Maldonado read defendant Castro his *Miranda* rights once

18  again at that time as follows:

19               Q: Ah, you have the right to remain silent.  Understand?

20               A: Mm-hm.

21               Q: Yes or no?

22               A: Yes.

23

---

24  [5]  Q: "You have the right to have an attorney before and during any questioning.  Do you

25  understand?"  A: "Yes."  Q: "Okay.  If you cannot afford an attorney, one will be given to you free of charge before you are asked any question.  Do you understand?"  A:  "Hm."  Q: "Yes or

26  no?"  A:  "Yes."  Q: "Okay.  Is it okay if we talk?"  A:  "Yes."  (Doc. No. 119 at 6, 81.)

27  [6]  The interview was conducted from 4:11 p.m. to 9:24 p.m. and commenced again at 11:20 p.m.

28  and continued until 11:53 p.m. with FBI Agent Demmon present for the last part of the questioning.

1    Q: Ah, anything you say can be used against you in a court.
     Understand?

2    A: Yes.

3    Q: Ah, you have the right to have an attorney before and during any
4    questioning.  Understand?

5    A: Yes.

6    Q: Ah, if you cannot afford to pay an attorney one will be provided
     to you at no cost even before you are asked any questions.
7    Understand?

8    A: Yes.

9    Q: Okay. Is it okay if I show you these photos?

10   A: Yeah.

11   Q: Yeah? Okay.

12   A: But that about the lawyer how...?

13   Q: How?

14   A: That that you say about the attorney.

15   Q: Oh, that just means that if you would like - if you prefer to have
     an attorney here before we talk. . .

16   A: Hm.

17   Q: . . .that's your right.  But like I tell you, we're just going to show
18   you some photos.

19   A:  Okay.

20   Q:  Okay.  Is that okay?  We can …

21   A:  Yes.

22   Q:  … we can do that?  Okay.

23   A: (unintelligible)

24   (Doc. No. 119 at 341–43.)  The detectives then proceeded to show defendant Castro photographs

25   and asked him questions regarding the individuals depicted in those photos.  (*Id.* at 343–47.)

26   Defendant Castro later asked the detectives "how long am I going to be here? . . . Because I don't

27   have money to pay for an attorney."  (*Id.* at 349.)  Detective Maldonado responded, "No, if – if

28   you don't – there it says that they give you one at no cost."  (*Id.*)  Defendant Castro then

11

1    responded, "Ah, well then I want one." (*Id.*)  Detective Maldonado stated "Yes, they're going to

2    give one to you.  Already – already before you go to court they're going to give you, eh, an

3    attorney." (*Id.* at 350.)  This December 21, 2017 interview of defendant Castro by the detectives

4    lasted approximately 30 minutes.  (*See* Doc. No. 154 at 16.)

5          After the December 21, 2017 interview, defendant Castro was released from Fresno

6    County Jail at 5:39 p.m. because no formal criminal charges were filed against him as of that

7    time.[7]  (Doc. Nos. 138-10 ¶ 3; 154 at 16).  After he was released from jail, immigration officials

8    arrested him and brought him—for the first time—to ICE headquarters in Fresno, where he was

9    booked into ICE custody at 6:02 p.m.  (Doc. Nos. 138-4 at 2; 138-5 at 2–3.)  The government

10   contends that it was then, on the night of December 21, 2017—after the first two interrogations of

11   defendant Castro and after his arrest by immigration officers —, when ICE DO Sellenia Romero

12   read defendant Castro his immigration advisements including his right to counsel at no cost *to the*

13   *government* for the first time.  (Doc. No. 154 at 17–18 (citing Doc. No. 138-9 ¶¶ 4–5).)  The

14   government argues that this fact is confirmed by:  1) DO Romero's signed and dated proof of

15   service form indicating that she personally served the Advisements of Rights form (I-826) and a

16   Notice to Appear (I-862) on December 21, 2017, both of which advised defendant Castro of his

17   rights in immigration proceedings; and 2) defendant Castro initialed, dated, and fingerprinted the

18   I-826 and I-862 forms—unlike the blank, unsigned forms from December 19, 2017.  (Doc. No.

19   154 at 17 (citing Doc. No. 119 at 440–42).)

20         On December 22, 2017, at approximately 1:30 a.m., ICE officials attempted to place

21   defendant Castro in an immigration facility in Bakersfield.  (Doc. No. 138-5 at 2–3.)  However,

22   because that facility was at maximum capacity, he could not be held there.  (*Id.*)  Defendant

23   Castro was then taken to what is apparently an ICE "hold room" in Fresno.  (*Id.* at 2–3.)  On

24   December 22, 2017, at 1:54 p.m., he was finally moved to an immigration detention center in

25   Sacramento.  (Doc. Nos. 119 at 52, 444; 154 at 18; 138-5 at 2–3.)

26   /////

27   ────────────────────

28   ████████████████████████████████████████████████████████

On Friday, December 22, 2017, at approximately 5:00 p.m., FBI Agent Demmon presented United States Magistrate Judge Barbara A. McAuliffe a federal criminal complaint and the affidavit in support thereof, charging defendant Castro with kidnapping and murder in aid of racketeering, and conspiracy to kidnap and murder in aid of racketeering.  (Doc. No. 119 at 446.) Magistrate Judge McAuliffe signed both.  Later that evening at approximately 10:30 p.m., HSI Agent Kotman transported Castro from the Sacramento immigration facility to the Fresno County Jail where he was held on the then recently filed federal criminal charges.  (Doc. No. 138-7 ¶ 8.) On December 26, 2017, at 5:52 a.m., officers returned to question defendant Castro yet again at the Fresno County Sheriff's Office. (Doc. No. 119 at 354–434.)  Defendant Castro was thereafter transported to the federal courthouse in Fresno and made his initial appearance in this action for arraignment on the criminal complaint on the afternoon of December 26, 2017.  (Doc. No. 8.)

**B.      Suppression Sought on the Basis of the Decision in *United States v. San Juan-Cruz***

Defendant Castro first moves to suppress all of his interrogation statements on the grounds that they were obtained in violation of the holding in *United States v. San Juan-Cruz*, 314 F.3d 384 (9th Cir. 2002), because he received confusing and conflicting immigration and *Miranda* advisements regarding his right to counsel upon first being taken into custody on December 19, 2017.  That argument fails, however, because as explained below, there is no factual or evidentiary support for it.

As noted, one aspect of a proper *Miranda* warning is the advisement of one's right to have an attorney present prior to any questioning and that, if one cannot afford an attorney for that purpose, one will be appointed for them prior to any questioning.  *Miranda*, 384 U.S. at 479.[8]  In *San Juan-Cruz* the defendant argued that he had been taken into custody by a Border Patrol Agent

---

[8]  In his pending motion defendant Castro does not directly challenge the content of any of the *Miranda* advisements given to him by detectives on any ground other than that those advisements were confusing based upon his allegation that he had received the administrative immigration advisement on December 19, 2017 prior to the *Miranda* advisement.  More specifically, defendant Castro has not asserted that the *Miranda* advisement given to him by detectives was, on its face, flawed.  (Doc. No. 119 at 80–81.)  Defendant Castro does separately make arguments about whether he invoked the right to counsel and whether investigating officers responded properly to his inquiries about that right.  (*See* Doc. Nos. 119 at 11–12, 164 at 4–5.)

who first read him his immigration administrative rights including his right to have an attorney present during questioning but "not at the Government's expense" and then was advised of his *Miranda* rights including that if he wished to have an attorney present and could not afford one, one would be appointed for him. 844 F.3d at 387–88. In the context of that factual background, the Ninth Circuit stated:

> San Juan argues that these two sets of conflicting instructions were read to him one after another and, as a result, their meaning became unclear. We agree.
>
> When one is told clearly that he or she does not have the right to a lawyer free of cost and then subsequently advised, "[i]f you can't afford a lawyer, one will be appointed for you," it is confusing. Requiring someone to sort out such confusion is an unfair burden to impose on an individual already placed in a position that is inherently stressful. *See Miranda*, 384 U.S. at 436 ("the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals."); 457 (recognizing that an atmosphere of custodial interrogation "carries its own badge of intimidation. To be sure, this is not physical intimidation, but it is equally destructive of human dignity."); *Dickerson v. United States*, 530 U.S. 428 (2000) ("custodial police interrogation, by its very nature, isolates and pressures the individual ...").
>
> The totality of the circumstances in this case compels us to find that the warnings given to San Juan were indeed confusing. From San Juan's perspective, it was entirely unclear what the nature of his rights was under the Fifth Amendment. Specifically, San Juan could not reasonably ascertain from the warnings provided to him by the Government whether he could or could not retain the services of an attorney for free.
>
> In order to be valid, a *Miranda* warning must convey clearly to the arrested party that he or she possesses the right to have an attorney present prior to and during questioning. *See Connell*, 869 F.2d at 1353. The warning also must make clear that if the arrested party would like to retain an attorney but cannot afford one, the Government is obligated to appoint an attorney for free. *Id*.
>
>                                         * * *
>
> When a warning, not consistent with *Miranda*, is given prior to, after, or simultaneously with a Miranda warning, the risk of confusion is substantial, such that the onus is on the Government to clarify to the arrested party the nature of his or her rights under the Fifth Amendment. The Government should not presume after having read two sets of contradictory warnings to an individual that he or she possesses sufficient legal or constitutional expertise to understand what are his or her rights under the Constitution. *See Miranda*, 384 U.S. at 472 ("No amount of circumstantial evidence that the person may have been aware of this right will suffice . . . . Only through such

1

                a warning is there ascertainable assurance that the accused was aware
                of this right.").

2

*Id*. at 388–89.[9]

3

        Defendant Castro's motion to suppress all of his interrogation statements under the

4

decision in *San Juan-Cruz* is based entirely on his counsel's assertion that the defendant was

5

advised of his administrative immigration rights (including the advisement in that context of the

6

right to have counsel present at no expense to the government) by DO Jacques on December 19,

7

2017, approximately 1.5 to 2 hours before he was Mirandized by Fresno County Sheriff's

8

Department detectives.  (*See* Doc. No. 119 at 5.)  In support of this argument, defendant Castro

9

submits as evidence only his Exhibit 1, a Notice to Appear, Warrant, Notice of Custody

10

Determination and Record of Deportable Alien (I-213), dated December 19, 2017.  (*Id*. at 40–52.)

11

In the Record of Deportable Alien (I-213) portion of that exhibit DO Jacques did write that on

12

that date "Castro was notified of his administrative rights."  (*Id*. at 48.)  However, as noted above,

13

nowhere on the forms making up Exhibit 1 where the signature of the alien is called for does

14

defendant Castro's signature appear.  (*Id*. at 42, 43, 44, 45, 52.)  Nor are any of the certificates of

15

service signed by a deportation officer so as to indicate that defendant Castro was served with the

16

notices on December 19, 2017.  (*Id*.)  Most importantly, DO Jacques has submitted a sworn

17

declaration attesting that she "is positive" she did not read defendant Castro his immigration

18

administrative advisements on December 19, 2017, because she would have had him sign, initial,

19

and date the forms on that date if she had.  (Doc. No. 138-8 ¶¶ 5–6.)[10]  It is undisputed that

20

defendant Castro was not released from Fresno County Jail and brought for the first time to ICE

21

22

---

[9]   The Ninth Circuit noted that a discrepancy in the record as to how much time elapsed between

23

the immigration and *Miranda* advisements was not dispositive under the circumstances in that
case.  *San Juan-Cruz*, 314 F.3d at 389.  "More important than the timing of the Government's

24

warnings is whether the substance, content, and clarity of the warnings conveyed to [defendant]
his rights under *Miranda*," and upon consideration of the totality of circumstances, the Ninth

25

Circuit concluded that the warnings given in that case did not clearly convey to the defendant the
right to free counsel.  *Id.* at 388–89.

26

27

[10]   The other relevant portions of that declaration are set forth in their entirety above.  In short,
DO Jacques has explained in detail the actual sequence of events in this case and clarified any

28

ambiguities posed by defendant's Exhibit 1.  (Doc. No. 138-8.)

1    headquarters in Fresno for booking until February 21, 2019 at 6:02 p.m.. (Doc. Nos. 138-4 at 2;

2    138-5 at 2–3.) It was then that ICE DO Romero read defendant Castro his immigration

3    advisements as evidenced by I-826 and I-862 forms initialed, dated, and fingerprinted by

4    defendant Castro on that date. (Doc. No. 154 at 17 (citing Doc. No. 119 at 440–42).)

5        There is simply no evidence then that DO Jacques read defendant Castro his immigration

6    administrative advisements on December 19, 2017, including the potentially confusing

7    advisement of his right to counsel without cost to the government. Rather, the uncontroverted

8    evidence before the court establishes that defendant Castro was not read his immigration

9    administrative advisements until the evening of December 21, 2017, when he was first booked

10    into ICE custody. (*Id*. at 436–43; Doc. Nos. 138-5 at 2–3; 138-9 ¶¶ 3–5.) Thus, approximately

11    two days passed after defendant was first read his *Miranda* rights by detectives on December 19,

12    2017, waived those rights and voluntarily agreed to be interviewed by detectives, before he

13    received his immigration administrative advisements from DO Romero. (Doc. Nos. 119 at 56,

14    80–81, 436–43; 138-5 at 2–3; 138-9 ¶¶ 3–5.) Moreover, the second interview of defendant Castro

15    by detectives occurred on December 21, 2017 at least 1.5 hours *before* he was taken into ICE

16    custody and advised of his administrative rights by DO Romero. (*See* Doc. No. 138-5 at 2–3; *see*

17    *also* Doc. Nos. 119 at 341; 154 at 14, 16.) Given this sequence of events (*Miranda* advisement,

18    waiver of rights and interrogation, followed by later administrative advisement) there is no

19    credible claim that defendant Castro was confused by the advisements regarding his right to have

20    counsel appointed on his behalf and present for his interrogation by the detectives. As such,

21    defendant Castro's motion to suppress his interrogation statements on the grounds that he

22    received confusing and misleading advisements regarding his right to counsel as prohibited by the

23    /////

24    /////

25    /////

26    /////

27    /////

28    /////

1   Ninth Circuit in *San Juan-Cruz* (Doc. No. 119 at 7 (citing *id.* at 436–41)), will be denied.[11]

2   **C.**   **Motion to Suppress Statements Based on Unlawful Responses to Inquiries Regarding**
3        **Right to Counsel and Continued Interrogation After Invocation of Right to Counsel**

4        Defendant Castro also moves to suppress statements he made to Detectives Maldonado

5   and Mora on December 21, 2017 when they interrogated him for the second[12] time, as well as

6   subsequent statements he made on December 26, 2017 during a third interrogation.  (Doc. No.

7   _____

8   [11]  The court also notes that unlike the situation confronted by the Ninth Circuit in *San Juan-Cruz*,
     defendant Castro does not contend that the *Miranda* and immigration advisements were confusing
9    because they were read to him by the same agent.  Rather, here, Fresno County Sheriff's
     Department Homicide Detective Maldonado read defendant Castro his *Miranda* rights on
10   December 19, 2017 at the county jail (Doc. No. 119 at 56, 80) and DO Romero on December 21,
     2017, served Castro at ICE offices with the forms including the immigration advisements and the
11   respective advisements.  (Doc. Nos. 119 at 436–43; 138-9.)  *See San Juan-Cruz*, 314 F.3d at 387–
     88; *United States v. De La Cruz*, 835 F.3d 1, 7–9 (1st Cir. 2016) (affirming the denial of motion
12   to suppress where the appellant received *Miranda* warnings and confessed before being given
     administrative warnings, different officials administered different warnings, agents explained the
13   difference between criminal investigators and ICE, and spatial and temporal gaps existed between
     warnings); *United States v. Pereda-Rebollo*, 357 F. App'x 31, 33 (9th Cir. 2009) (rejecting a
14   defendant's argument that his post-*Miranda* statements should have been suppressed on the
     grounds that the advisements received were contradictory and inconsistent, reasoning that the
15   "record shows [defendant] was fully informed of his right to counsel before and during
     questioning, and that he knowingly and voluntarily waived that right."); *United States v. Long-*
16   *Payton*, No. 3:08-cr-07, 2013 WL 1500682, at *5 (W.D. Pa. April 10, 2013) (distinguishing *San*
     *Juan-Cruz* where the two inconsistent warnings were given by two different individuals at
17   different locations and defendant was never informed she had a right to an attorney only at her
     own expense).  *But see United States v. Ramirez-Carrillo*, 759 F. App'x 612, 613 (9th Cir. 2019)
18   (reversing the district court's denial of motion to suppress where the *same* border patrol agent
     read defendant "two sets of rights that conflicted on the issue whether the attorney's services were
19   to be paid by the Government," attempted to explain that administrative rights no longer applied,
     and the agent never clarified defendant's right to an attorney free of charge).  Finally, the record
20   here reflects that on December 19, 2017, defendant Castro was clearly aware that there was a
     difference between ICE and the Sheriff's Department detectives.  (*See, e.g.*, Doc. No. 119 at 113
21   (A:  ". . . I prefer to talk to the ones I was talking to (at first) . . . . With the other officers."  Q:
     "[W]hy's that?"  A: "Well, I don't know.  I have trust in them."  Q: ". . . we work with them too,
22   sometimes.").)

23

24   [12]  As noted, Detectives Maldonado and Mora met two days earlier with defendant Castro, on
25   December 19, 2017, at which time Castro was read his *Miranda* rights, waived them, and
     answered the detectives' questions for more than five hours.  (*See supra* at 10 n.5.)  In its request
26   for supplemental briefing, the court inquired as to whether the waiver obtained on December 19
     could operate as a waiver for purposes of defendant Castro's questioning on December 21.  (Doc.
27   No. 185 at 3.)  At the February 26, 2021 hearing, the government specifically disclaimed that it
     was asserting any such argument.  (*See* Doc. Nos. 194 at 8 n.5, 198.)

28

119 at 9–12.)  Defendant Castro contends that he brought up his right to counsel *twice* on December 21, 2017:  (1) first, early in that interrogation session, he claims to have *inquired* about the right to counsel; (2) then later during that interrogation he claims to have *invoked* his right to counsel "unequivocally."  (*See id*. at 11–12.)  Defendant Castro argued in his opening brief on the pending motion that Detective Maldonado acted unlawfully when responding to his initial inquiry about counsel by making statements that "blurred his entitlement" to counsel, and that therefore his subsequent statements should be suppressed.  (*Id*.)  Defendant Castro clarified this argument in his reply brief, explaining that even if his initial inquiry about counsel was too ambiguous to immediately trigger a cessation of questioning, the investigating officers were:  (1) obligated to clarify his intent in inquiring regarding that subject; and (2) precluded from making misleading comments in response to his ambiguous inquiries about his right to counsel.  (Doc. No. 164 at 4.)  With respect to the later, "unequivocal" invocation, defendant Castro contends all of his subsequent statements should be suppressed.  (Doc. No. 119 at 11.)

        1.     <u>Inquiry About Counsel</u>

       The court will first evaluate the exchange about the right to counsel that took place when Detectives Maldonado and Mora began questioning defendant Castro on December 21, 2017. Detective Maldonado read defendant Castro his *Miranda* rights again at that time, eventually turning to the right to counsel:

> Q: Ah, you have the right to have an attorney before and during any questioning.  Understand?
>
> A: Yes.
>
> Q: Ah, if you cannot afford to pay an attorney one will be provided to you at no cost even before you are asked any questions. Understand?
>
> A: Yes.
>
> Q: Okay. Is it okay if I show you these photos?
>
> A: Yeah.
>
> Q: Yeah? Okay.
>
> A: But that about the lawyer how...?

1    Q: How?

2    A: That that you say about the attorney.

3    Q: Oh, that just means that if you would like - if you prefer to have an attorney here before we talk. . .

4    A: Hm.

5    Q: . . .that's your right.  But like I tell you, we're just going to show you some photos.

6

7    A:  Okay.

8    Q:  Okay.  Is that okay?  We can …

9    A:  Yes.

10    Q:  … we can do that?  Okay.

11    A:  (unintelligible)

12   (Doc. No. 119 at 341–43.)  The detectives proceeded to show defendant Castro photos and ask

13   him questions regarding the individuals depicted in those photos.  (*Id.* at 343–47.)

14          A threshold question is whether defendant Castro invoked his right to counsel in the above

15   exchange.  "If the [defendant] states that he wants an attorney, the interrogation must cease until

16   an attorney is present."  *Miranda*, 384 U.S. at 445.  "[W]hen an accused has invoked his right to

17   have counsel present during custodial interrogation, a valid waiver of that right cannot be

18   established by showing only that he responded to further police-initiated custodial interrogation

19   even if he has been advised of his rights."  *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).  "[T]he

20   right to counsel could be invoked only 'unambiguously.'"  *Jones v. Harrington*, 829 F.3d 1128,

21   1137 (9th Cir. 2016) (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)).  However, the

22   Ninth Circuit has explained:

23              [T]he Court also held that the standard for invoking the right to
              counsel unambiguously was not a demanding one.  A suspect need
24              only invoke his rights "sufficiently clearly that a reasonable police
              officer in the circumstances would understand the statement to be
25              [such] a request."  He need not specifically reference his
              constitutional rights, nor need he use any specific terminology.
26

27   *Jones*, 829 F.3d at 1138 (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)).  But "if a

28   suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable

19

1    officer in light of the circumstances would have understood only that the suspect *might* be

2    invoking the right to counsel, [the Supreme Court's] precedents do not require the cessation of

3    questioning."  *Davis*, 512 U.S. at 459 (holding that the statement "Maybe I should talk to a

4    lawyer" was not a request for counsel) (emphasis added).  "If the statement fails to meet the

5    requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect."

6    *Davis*, 512 U.S. at 459 (citing *Moran*, 475 U.S. at 433 n.4).

7           Although awkwardly phrased, perhaps because of the translation, defendant Castro

8    appears to have been asking Detectives Maldonado and Mora on December 21, 2019:  "How can

9    I get a lawyer?"  The government argues that this was not a clear and unambiguous invocation of

10   his right to counsel.  (Doc. No. 154 at 25 (citing Doc. No. 119 at 349).)  Defendant Castro does

11   not seriously contend otherwise, seeming to concede that his statement was ambiguous.  (*See*

12   Doc. No. 164 at 4.)  The undersigned agrees with the government on this point.  Under the *Davis*

13   standard, a suspect's inquiry about "how to obtain an attorney does not constitute an

14   unambiguous assertion of his right."  *Soffar v. Cockrell*, 300 F.3d 588, 595 (5th Cir. 2002)

15   (finding that defendant who specifically asked how he could get a court appointed attorney did

16   not unambiguously request counsel); *United States v. Tian Xue*, No. CR 16-22-4, 2018 WL

17   3328165, at *6–8 (E.D. Pa. July 6, 2018) (finding that a defendant who asked "[h]ow can find a

18   lawyer?" was not unambiguously requesting the assistance of counsel); *see also Lord v.

19   Duckworth*, 29 F.3d 1216, 1220–21 (7th Cir. 1994) (finding the statement, "I can't afford a

20   lawyer but is there any way I can get one?" was not a clear request); *but see United States v. Naik*,

21   No. 19-CR-373 (TSC), 2020 WL 531992, at *6–7 (D.D.C. Feb. 3, 2020) (finding that defendant

22   who asked "how can I get a lawyer?" was unambiguously requesting counsel and that the

23   investigator subsequently undermined and contradicted the administration of defendant's

24   *Miranda* rights by implying that the defendant did not have the right to appointed counsel free of

25   charge).  In light of the above authorities, the court concludes that in stating "But that about the

26   lawyer how...?" and "that you say about the attorney" defendant Castro did not unambiguously

27   invoke his right to counsel.

28   /////

1    The inquiry may not end there, however.  In 2008, the Ninth Circuit held that the "clear

2  statement" rule of *Davis* "applies only after the police have already obtained an unambiguous and

3  unequivocal waiver of *Miranda* rights" and that "[p]rior to obtaining such a waiver . . . an officer

4  must clarify the meaning of an ambiguous or equivocal response to the Miranda warning before

5  proceeding with general interrogation."  *United States v. Rodriguez*, 518 F.3d 1072, 1074, 1080

6  (9th Cir. 2008).  Under such circumstances, the government continues to bear its "heavy burden"

7  of proving an initial knowing and intelligent waiver of *Miranda*.  *Id*.

8    *Rodriguez* concerned a suspect who had been arrested for a weapons violation.  *Id*. at

9  1074.  The arresting officer read Rodriguez his *Miranda* rights in the field and then specifically

10  asked him if he wished to speak with law enforcement.  *Id*. at 1075–76.  Rodriguez responded:

11  "I'm good for tonight."  *Id*. at 1075.  The arresting officer later testified that he understood this to

12  mean that Rodriguez was willing to talk, but he did not immediately begin the interrogation;

13  rather he began questioning Rodriguez a "short time later," eventually eliciting a confession.  *Id*.

14  The Ninth Circuit found the phrase "I'm good for tonight" to be ambiguous as to whether or not

15  Rodriguez was invoking his right to silence.  *Id*. at 1077.  This triggered the announcement of the

16  above mentioned "clarification rule."  *Id*. at 1080.  "[B]ecause his interrogator failed to clarify

17  Rodriguez's wishes with respect to his Miranda warnings" the defendant's statements were

18  suppressed.  *Id*. at 1081.

19    In reaching this conclusion, the Ninth Circuit discussed in some detail the distinction

20  between so-called "initial waiver cases" to which the "clarification rule" applied, and "post-

21  waiver" cases, to which the *Davis* "clear statement" rule applied.  *Id*. at 1078–79.

22    The holding of *Davis*, however, addressed itself narrowly to the facts
     of the case:  "We therefore hold that, *after a knowing and voluntary*

23   *waiver of the Miranda rights*, law enforcement officers may *continue*
     questioning until and unless the suspect clearly requests an attorney."

24   *Id*. at 461 (emphasis added).  The text of the opinion is also narrowly
     drawn:  it asks whether "*further* questioning" is permitted upon an

25   equivocal or ambiguous invocation of the right to counsel, *id*. at 454,
     458 (emphasis added), or, rather, whether questioning must "cease,"

26   *id*. at 456, 459, 460 ("cessation"), 461, 462, or "stop," *id*. at 459,
     462—all implying that legal questioning, following a valid initial

27   *Miranda* waiver, was already occurring.  Indeed, prior compliance
     with *Miranda* is critical to the logic of the Supreme Court's holding:

28

[T]he primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves. "[F]ull comprehension of the rights to remain silent and request an attorney [is] sufficient to dispel whatever coercion is inherent in the interrogation process." *A suspect who knowingly and voluntarily waives his right to counsel* after having that right explained to him has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection—if a suspect *subsequently* requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect.

*Id.* at 460–61 (citations omitted, emphasis added).

In other words, the "clear statement" rule of *Davis* addresses only the scope of invocations of *Miranda* rights in a post-waiver context. It is well settled that "[i]nvocation and waiver [of *Miranda* rights] are entirely distinct inquiries, and the two must not be blurred by merging them together." *Smith v. Illinois*, 469 U.S. 91, 98 (1984). *Davis* addressed what the suspect must do to restore his Miranda rights after having already knowingly and voluntarily waived them. It did not address what the police must obtain, in the initial waiver context, to begin questioning.

The existence of a prior waiver explains how *Davis* can be reconciled with the Supreme Court's historic presumption against finding waiver of constitutional rights. *Miranda* itself, in describing the government's burden to prove waiver as "heavy," stated that "[t]his Court has always set high standards of proof for the waiver of constitutional rights, and we reassert these standards as applied to in custody interrogation." 384 U.S. at 475 (citation omitted). Prior to the *Miranda* warning and waiver, the police have no right to question the suspect. *Id.* at 471 (describing the warning as "an absolute prerequisite to interrogation"). Once that "heavy burden" has been met, however, *Davis* indicated that the benefits of *Miranda* have been realized: the suspect has understood his rights and has freely chosen to proceed. It is then the police's right to interrogate the suspect, and the suspect, in effect, who bears the "burden" of cutting off questioning by unambiguously retracting the clear waiver he has already given.

*Rodriguez*, 518 F.3d at 1078–79.

There is debate over whether or not *Rodriguez* is still good law in light of more recent Supreme Court decisions, including the 2010 decision in *Berghuis*, 560 U.S. at 382. *Berghuis* involved a murder suspect (Thompkins) who was given *Miranda* warnings but refused to sign a *Miranda* waiver form. *Id.* at 374–75. The record was unclear as to whether any officer verbally confirmed that Thompkins understood the rights listed on the form. *Id.* at 375. Thereafter, Thompkins sat largely in silence during a three-hour interrogation, occasionally offering one-

22

1   word or one-phrase answers to questions, including, almost three hours into the interrogation,

2   some incriminating one-word answers. *Id*. at 375–76. Thompkins argued that he had invoked his

3   right to remain silent by not saying anything for a significant period of time, thereby triggering a

4   duty on the part of the investigators to cease questioning him. *Id*. at 380–81. The Supreme Court

5   disagreed, holding for the first time that *Davis*' clear statement rule applied not only to the right

6   to counsel but also the right to remain silent. *Id*. at 381.

7       Some courts have suggested that *Berghuis* effectively overruled *Rodriguez*. In *United

8   States v. Little*, No. CR 20-1258 KG, 2020 WL 4923670, at *5 (D.N.M. Aug. 21, 2020), for

9   example, the district court pointed out that *Berghuis* held "[t]he *Miranda* rule and its requirements

10  are met if a suspect receives adequate *Miranda* warnings, understands them, and has an

11  opportunity to invoke the rights before giving any answers or admissions." This language

12  suggests that there should be no distinction drawn between the initial and post-waiver contexts

13  with respect to any obligation on the part of police to cease questioning or clarify the meaning of

14  the defendant's statement. *See Berghuis*, 560 U.S. at 388–89 ("In sum, a suspect who has

15  received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives

16  the right to remain silent by making an uncoerced statement to the police"); *see also United States

17  v. Robeson*, 2016 WL 3257595, at *4 (N.D. Cal. June 14, 2016) ("I agree with the government

18  that *Berghuis* is 'clearly irreconcilable' with the clarification rule."). But, as the dissent in

19  *Berghuis* pointed out, the majority in that decision failed to struggle with the distinction between

20  initial versus post-waiver invocations of the right to counsel:

21          The suspect's equivocal reference to a lawyer in *Davis* occurred only
            after he had given express oral and written waivers of his rights.
22          *Davis*' holding is explicitly predicated on that fact. *See* 512 U.S., at
            461 ("We therefore hold that, after a knowing and voluntary waiver
23          of the *Miranda* rights, law enforcement officers may continue
            questioning until and unless the suspect clearly requests an
24          attorney"). The Court ignores this aspect of *Davis*, as well as the
            decisions of numerous federal and state courts declining to apply a
25          clear-statement rule when a suspect has not previously given an
            express waiver of rights.
26

27  *Berghuis*, 560 U.S. at 407–08 (Sotomayor, J., dissenting) (omitting footnote citing *Rodriguez*,

28  518 F.3d at 1074)).

On the other hand, one district court in California has found that "the clarification rule survives *Berghuis*" in part because "[i]n *Berghuis*, the suspect made no ambiguous statement between being *Mirandized* and answering questions, and so the Supreme Court was not called upon to address the viability of the 'clarification rule.'" *United States v. Hurtado*, 21 F. Supp. 3d 1036, 1041 (N.D. Cal. 2014) (declining to apply the clarification rule because the statement in question was not ambiguous). As the district court in *Hurtado* put it: "While a court looks to the totality of the circumstances in determining the voluntariness of a waiver, the Ninth Circuit has drawn, and has yet to erase, one bright line among those circumstances: when a defendant makes an ambiguous, unclarified response to an officer asking if he wishes to speak to police, that compels a conclusion that there has been no waiver." *Id*; *see also United States v. Eagle*, No. CR 18-41-GF-BMM, 2018 WL 3996953 *2–*3 (D. Mont. Aug. 21, 2018) (applying *Rodriguez*'s clarification rule post-*Burghuis*, albeit without discussing the potential overruling effect of *Berghuis*); *United States v. Voris*, No. CR-16-02267-001-TUC-JGZ(DTF), 2017 WL 11444152, at *2 (D. Ariz. Nov. 7, 2017) (finding post-*Berghuis* that "Law enforcement officers have a duty to clarify the meaning of a suspect's ambiguous or equivocal waiver of *Miranda* rights before proceeding with general interrogation" under *Rodriguez*, but without discussing the potential overruling of *Rodriguez* by *Berghuis*).

Here, the government suggests that this debate can be resolved by examining a Ninth Circuit opinion that post-dates *Hurtado*: *Sessoms v. Grounds*, 776 F.3d 615 (9th Cir. 2015) (*en banc*). (Doc. No. 194 at 3– 4.) In *Sessoms*, a defendant was arguably attempting to invoke the right to counsel during a pre-interrogation conversation with officers (i.e., a conversation that took place prior to any *Miranda* warnings)—the exact timeframe at issue in *Rodriguez*. *See id*. at 618–19. Sessoms sought habeas review of his California state court conviction under 28 U.S.C. § 2254. *See id*. at 618. The relevant facts in that case are as follows. When officers entered the interrogation area, they exchanged peasantries with Sessoms. *Id*. at 619. The defendant then asked: "There wouldn't be any possible way that I could have a—a lawyer present while we do this?" *Id*. The officers ignored this question. *Id*. Then Sessoms said: "Yeah, that's what my dad asked me to ask you guys . . . uh, give me a lawyer." *Id*. Instead of ceasing all questioning,

1    the officers carried on talking, making efforts to convince Sessoms that his accomplices had

2    already told them what had happened and impressing upon Sessoms that the only way to tell his

3    side of the story was for him to talk right away without an attorney. *Id*. Officers *then* read

4    Sessoms his *Miranda* rights. *Id*. Thereafter, he agreed to talk and made incriminating statements.

5    *Id*.

6          The California Court of Appeal found that Sessoms' statements regarding his desire for

7    counsel were ambiguous under *Davis*. *Id*. at 620. On habeas review, the district court denied

8    relief. *Id*. A three-judge panel of the Ninth Circuit agreed finding the state court had reasonably

9    applied clearly established federal law, namely *Davis*. *Id*. However, on rehearing *en banc* the

10   Ninth Circuit reversed, reasoning that *Davis's* requirement that a request for counsel be

11   unambiguous applies only after a suspect has been informed of his *Miranda* rights. *Id*.[13]

12   Alternatively, the majority also concluded that Sessoms had "clearly expresse[d] his desire for an

13   attorney." *Id*. at 620–21.

14         California petitioned for a writ of certiorari, arguing in part that *Davis* and *Berghuis* did

15   not distinguish between pre-waiver and post-waiver invocations and therefore a suspect must

16   unambiguously invoke his *Miranda* rights whether he does so before or after he waives those

17   rights. Brief for Petitioner at 15–16, *Grounds v. Sessoms*, 570 U.S. 928 (2013) (No. 12-804),

18   2012 WL 6759749. The Supreme Court granted the state's petition for a writ of certiorari and

19   then issued a one paragraph decision vacating the judgment and remanding the matter in light of

20   its decision in *Salinas v. Texas*, 570 U.S. 178 (2013). *Sessoms*, 570 U.S. 928.

21         On remand, the Ninth Circuit began by explaining why it would assume *Davis*' clear

22   invocation requirement would apply to Sessoms:

23              We now reconsider this case in light of *Salinas*, which suggests,
              contrary to the reasoning of the first *en banc* court, that *Davis's*
24              requirement of an unambiguous invocation of a right to counsel
              applies to pre-*Miranda* statements. Although *Salinas* points in that
25              direction, it involved a noncustodial interrogation. *Salinas*, 133 S.

26   ───────────────
     [13] The *en banc* ruling explicitly relied upon *Rodriguez* in support of its conclusion that *Davis*
27   only applied to statements made after a suspect had waived his *Miranda* rights. *Sessoms v.*
     *Runnels*, 691 F.3d 1054, 1061 (9th Cir. 2012) (citing *Rodriguez*, 518 F.3d at 1072), *cert. granted,*
28   *judgment vacated sub nom. Grounds v. Sessoms*, 570 U.S. 928 (2013).

1
2
3
4
5
6
7

Ct. at 2183.  Indeed, Justice Alito's plurality opinion stressed that the noncustodial nature of the interview placed the "petitioner's situation outside the scope of *Miranda*."  *Id*. at 2180.  This case, in contrast, involves a custodial interrogation in which the defendant should have been informed of his rights before he could knowingly waive them.  *See Miranda*, 384 U.S. at 467–68.  We nevertheless assume that the clear invocation requirement of *Davis* applies to *Sessoms*. With this requirement clearly in mind, we hold that, under the circumstances, a reasonable law enforcement officer would have understood Sessoms's statements as an unambiguous request for counsel, which should have cut off any further questioning under clear Supreme Court precedent.

8   *Sessoms*, 776 F.3d at 621 (emphasis added).  The Ninth Circuit sitting *en banc* went on to find

9   that the granting of federal habeas relief was appropriate in that case because the state court

10  unreasonably applied clearly established Supreme Court precedent by failing to view Sessoms's

11  comments in context and, ultimately, by failing to conclude that Sessoms' words amounted to a

12  clear invocation of his  right to counsel.  776 F.3d at 626–29.

13       For purposes of the instant motion, it appears that the Ninth Circuit indicated in its latest

14  *en banc* decision in *Sessoms* that it interprets *Salinas* as "suggests[ing] . . . that *Davis*'s

15  requirement of an unambiguous invocation of a right to counsel applies to pre-*Miranda*

16  statements."  *Id*.  Any such suggestion would seem to run contrary to the holding in *Rodriguez*.

17  While this aspect of the Ninth Circuit's decision in *Sessoms* was arguably *dicta*—because the

18  Ninth Circuit separately found Sessoms' statements to be an unequivocal invocation of the right

19  to counsel—*Sessoms* is the Ninth Circuit's only comment on the topic since the Supreme Court's

20  decisions in *Berghuis* and *Salinas*.  Reading all of these decisions together, the court concludes

21  with some considerable trepidation that the clarification rule recognized by the Ninth Circuit in

22  *Rodriguez* is no longer viable even though that court has not specifically recognized that the

23  holding in *Rodriguez* has been abrogated .

24       Defendant Castro maintains that even if detective Maldonado was not under any

25  *obligation* to seek clarification of defendant's inquiries about the right to counsel, he nonetheless

26  acted unlawfully by attempting to mislead and/or divert defendant Castro away from the subject

27  of counsel by indicating that he was "just going to show [the defendant] some photos."  (*See* Doc.

28  No. 195 at 3–4.)  Castro cites *Henry v. Kernan*, 177 F.3d 1152, 1158 (9th Cir. 1999), *amended*

*and superseded on other grounds*, 197 F.3d 1021 (9th Cir. 1999), for the general proposition that an interrogator who distorts or misrepresents a defendant's *Miranda* rights can render any resulting statements coerced.  (*See* Doc. No. 119 at 11.)  In *Henry*, the defendant, after being advised of his rights, eventually confirmed that he wanted an attorney.  177 F.3d at 1156.  Despite "clear and repeated invocations" of his *Miranda* rights, officers continued to question Henry.  *Id*.  Immediately after Henry's direct request for an attorney, officers asked him why he shot the victim.  *Id*.  Henry provided some incriminating responses but then asked whether he was "supposed to keep talking without an attorney."  *Id*.  One of the officers interrupted Henry and stated:  "Listen, what you tell us we can't use against you right now . . . We'd just would like to know."  *Id*.  After that, the defendant gave a lengthy and detailed incriminating statement.  *Id*. at 1157.

The Ninth Circuit reasoned that Henry's questioning was "psychologically coercive," the investigating detectives used "slippery and illegal tactics" to "overc[o]me Henry's will," and Henry "continued his confession only as a result of their deception," which was "deliberately designed to undermine Henry's ability to control the time at which the questioning occurred, the subjects discussed, and the duration of the interrogation."  *Id*.  In particular, the detectives' "misleading comments were intended to convey the impression that anything said by the defendant would not be used against him for *any* purposes."  *Id*.  "Because the police tactics and trickery produced a confession which was neither rational nor the product of an essentially free and unconstrained choice," the Ninth Circuit concluded that "Henry's post-*Mirandized* statements were involuntary, and therefore inadmissible for *any* purpose," including impeachment.  *Id*. at 1158.

In *United States v. Wysinger*, 683 F.3d 784, 803 (7th Cir. 2012), the court addressed issues similar to those posed in *Henry*.  There, the defendant was questioned by two investigators following his arrest.  *Id*. at 789.  When the investigators entered the interrogation room, defendant asked whether he needed a lawyer.  *Id*.  The agent stated, "Well, we're going to talk about that," thereby avoiding answering the question in the first of what the court found to be several attempts by the investigators to divert Wysinger's attention from asserting his rights.  *Id*. at 789, 800-801.

The investigator told the defendant he was under arrest, and began to read him his rights.  *Id*. at

789.  The agent stated: "You have a right to talk to a lawyer for advice before we ask any

questions *or* have one—have an attorney with you during questioning.  If you can't afford a

lawyer, one will be appointed for you before we ask any questions.  Do you understand . . ." *Id*.

(emphasis added).  The investigator then slapped the table loudly, startling Wysinger, and

claimed he had felt something crawling on his neck.  *Id*.  According to the Seventh Circuit this

operated to "further divert[]" Wysinger "from the question he had just asked regarding his need

for a lawyer." *Id*. at 801.  Finally, one investigator stated:  "I'm gonna tell you what the story is.

You listen for a minute." *Id*.  The "story" referred to consisted of the agent telling Wysinger that

investigators had been watching him from some time, and had collected evidence against him, his

brother, and others.  *Id*.  The court found that this "provocative speech" was "undoubtedly"

designed to elicit incriminating responses and also "implied that questioning had not yet begun."

*Id*.  The agent also told Wysinger that "basically there are two choices here"—neither of which

involved invoking his right to remain silent or his right to have counsel present.  *Id*. at 801.

Instead, the agent stated:  "If you totally—if you didn't want to talk with us, down the road most

likely you're going to be charged with conspiracy to distribute cocaine.  Conspiracy is a tough

charge." *Id*.  The agent then explained the alternative of cooperation." *Id*.  These tactics elicited

various incriminating statements from Wysinger.  *Id*. at 801-802.  Thereafter, the agent stated that

the "questioning" was then about to begin, by, among other things, flipping open his notebook

and taking out his pen.  *Id*. at 802.  This finally triggered Wysinger to clearly invoke his right to

counsel.  *Id*.

Wysinger moved to suppress his statements, arguing in part that he was provided

inadequate and misleading *Miranda* warnings.  *Id*. at 786.  He contended that the wording implied

that his rights were conditioned on the beginning of questioning and that the agents implied

questioning had not yet begun.  *Id*. at 800.  The Seventh Circuit agreed, holding that the agent

misstated the *Miranda* warnings when he told the defendant he could speak with an attorney

before *or* during questioning rather than both before *and* during questioning.  *Id*. at 798.  The

court reasoned that "[t]he agent's divergence from the familiar script would put a suspect to a

1    false choice between talking to a lawyer before questioning or having a lawyer present during

2    questioning, when *Miranda* clearly requires that a suspect be advised that he has the right to an

3    attorney both before and during questioning." *Id*. at 799.  The court also found that the language

4    used by the had the potential to "cause a serious misunderstanding of one of the core *Miranda*

5    rights."  *Id*. at 800 (citation omitted); *see also California v. Prysock*, 453 U.S. 355, 360 (1981)

6    (reasoning that linking the right to counsel to some future event after interrogation does not fully

7    advise the suspect of the right to counsel).  In *Wysinger*, the mis-advisement was found to be

8    compounded by the fact that the agents used "various tactics to confuse Wysinger" regarding the

9    start of questioning and to divert him from exercising his rights.  683 F.3d at 803.  Accordingly,

10   the Seventh Circuit concluded that the incorrect warnings paired with the agent's tactics to

11   confuse the defendant rendered the warning inadequate and misleading and therefore the entire

12   interrogation was inadmissible.  *Id*.

13          *Wysinger* and *Henry* stand for the general proposition that "diversionary tactics," such as

14   implying that questioning had not yet begun, can play a role in depriving a defendant of the

15   "'knowledge essential to his ability to understand the nature of his rights and the consequences of

16   abandoning them.'" *Missouri v. Seibert*, 542 U.S. 600, 614, (2004) (Kennedy, J., concurring in

17   the judgment) (quoting *Moran*, 475 U.S. at 424).  But, in both of those cases, the diversionary

18   tactics were used within a broader context of other problems with the interrogations that

19   compounded the defendant's confusion.  In *Henry*, the diversionary tactic employed—falsely

20   indicating that any statements Henry made could not be used against him—was coupled with the

21   fact that detectives continued to question Henry even though he had requested an attorney, a

22   maneuver that "took unfair advantage" of the pressures inherent in an interrogation and which

23   were "likely to produce involuntary statements."  177 F.3d at 1158.  In *Wysinger*, "an incorrectly

24   worded *Miranda* warning, one suggesting that *Miranda* rights apply only to direct questioning or

25   to the time before direct questioning, followed by diversionary tactics that redirect the suspect

26   away from asserting those rights, frustrate[d] the purpose of the *Miranda* protections."  683 F.3d

27   at 800.

28   /////

29

1    The situation presented in the present case is not nearly as nefarious as those presented in

2    *Wysinger* and *Henry*.  This is particularly true if the December 21, 2017 interview is viewed in

3    the context of the December 19, 2017 interview that took place just a few days earlier.  As noted,

4    at 4:11 p.m. on December 19, 2017, approximately 90 minutes after defendant Castro's

5    immigration arrest, Detectives Maldonado and Mora began questioning him at the Fresno County

6    Sheriff's Office.  (See Doc. Nos. 119 at 5, 56; 154 at 14.)  The detectives first asked Castro a

7    number of background questions.  (Doc. Nos. 119 at 56-80.)  Defendant Castro was then

8    informed of his *Miranda* rights by the detectives and answered affirmatively when asked if he

9    understood each aspect of that advisement.   (Doc. No. 119 at 80–81.)  At the time of these

10   advisements and acknowledgements, defendant Castro appeared alert and coherent.  He gave no

11   indication that he did not understand anything that was being said to him.  Throughout the

12   subsequent 5.5 hours of questioning (with a short meal break), although he occasionally became

13   emotional, defendant Castro provided coherent answers to a wide range of questions put to him

14   by detectives.

15   Notably for purposes of this analysis, at one point during the interview on December 19,

16   Detective Maldonado asked defendant Castro whether he knew a particular person by reference to

17   that person's name.  (*Id*. at 178.)  After being shown a picture, defendant Castro indicated he was

18   able to identify the person.  (*Id*.)  Later, Detective Maldonado asked if defendant Castro knew a

19   different person.  (*Id*. at 197.)  Defendant Castro indicated that he did not know the name but

20   might remember "[w]ith a picture, maybe." (*Id*.)  There were other instances during the

21   December 19 interview when the detectives incorporated the use of photos into the flow of their

22   questioning of Castro.  (*See, e.g.,* video of 12/19/17 interview at 2 hours and 15 minutes, 2 hours

23   and 17 minutes; 2 hours and 19 minutes.)

24   In this context the court will address the interrogation of defendant Castro on December

25   21, 2017.  That meeting began with Detective Maldonado asking Castro if he "remember[ed] that

26   we spoke the other day, right?"  (*Id*. at 341.)  Then, Detective Maldonado indicated:  "[W]e want

27   to show you some photos if that's ok with you."  (*Id*.)  To this, defendant Castro answered "yes."

28   (*Id*.)  Detective Maldonado then re-*Mirandized* defendant Castro, stating explicitly that he was

30

doing so "[b]ecause I'm *speaking* with you and you're under arrest right now." (*Id.* (emphasis

added).)  As previously noted, defendant Castro indicated verbally that he understood each of the

enumerated rights.  (*Id.* at 341–42.)  He was then asked whether it was "okay" if the detective

could "show" him some photos.  Although defendant Castro responded "yes," he almost

immediately thereafter asked:  "But that about the lawyer how. . . ? . . . . That that you say about

the attorney." (Doc. No. 119 at 342.). Detective Maldonado answered by stating:  "Oh, that just

means that if you would like - if you prefer to have an attorney here before we talk. . . . that's

your right.  But like I tell you, we're just going to show you some photos." (*Id.*)  Detective

Maldonado's comment could be interpreted as a deliberate diversionary tactic designed to

confuse the defendant into misunderstanding when the questioning would begin and/or implying

that the questioning would *not* begin when Detective Maldonado "just" showed defendant "some

photos."  Detective Maldonado certainly could have been more precise with his choice of words.

However, when viewed in context, the court can find no basis upon which to believe that

defendant Castro would actually have been confused into thinking no questions would be posed

to him in connection with his viewing of those photos.  As mentioned, his previous interview on

December 19 was interspersed with questions from the detectives regarding the photographs of

people being shown to Castro.  In addition, Detective Maldonado specifically indicated before

reading defendant Castro his *Miranda* rights on December 21 that it was the investigators'

intention to *talk* with defendant Castro about the photos.  For these reasons, the instant case is

distinguishable from *Wysinger*, where multiple diversions obfuscated when the questioning of the

defendant would begin.  Moreover, as noted above, defendant Castro takes no issue with the

wording of the *Miranda* warnings he was given.

  In addition, neither the December 19 nor the December 21 interview evidenced any other

significant issues that might call into question the voluntariness of defendant Castro's statements

to detectives.  As noted above, courts are to consider the following factors in determining whether

a defendant "knowingly and intelligently waived [her] constitutional rights":

    (1) whether the defendant signed a written waiver; (2) whether the
    defendant was advised of his rights in his native tongue; (3) whether
    the defendant appeared to understand his rights; (4) whether a

1

2

3

defendant had the assistance of a translator; (5) whether the defendant's rights were individually and repeatedly explained to him; and (6) whether the defendant had prior experience with the criminal justice system.

4  *Garibay*, 143 F.3d at 538 (internal citations omitted).  Here, although no signed, written waiver

5  has been presented to the court (presumably because none was obtained), the verbal *Miranda*

6  warnings were properly worded; defendant Castro was advised of them individually in his native

7  tongue; and the defendant appeared to have understood his rights, as he acknowledged them

8  verbally without hesitation.  Upon reviewing the video recordings of the interviews, the court

9  finds that the detectives did not seek to intimidate or distract defendant Castro in any obvious

10 ways, such as by yelling or slamming furniture, or by exhibiting any other threatening behavior.

11      Defendant Castro argues that the absence of a written waiver, along with his undisputed

12 lack of education and lack of significant experience with criminal justice weigh against the

13 admission of any of his statements made during his interrogations.  Youth, lack of education, and

14 inexperience with the criminal justice system do not render statements *per se* involuntary, but

15 they do require the court to use "special care" in scrutinizing the record.  *See Rodriguez v.*

16 *McDonald*, 872 F.3d 908, 922 (9th Cir. 2017) (*citing Haley v. Ohio*, 332 U.S. 596, 599–600

17 (1948)).  The Ninth Circuit has called for close scrutiny regarding interrogations of those under

18 the age of 18.  *See Doody v. Ryan*, 649 F.3d 986, 1010 (9th Cir. 2011).  Defendant Castro was

19 more than nineteen years old at the time he was questioned in this investigation.  (*See* Doc. No.

20 119 at 46 (providing date of birth).)  Moreover, although defendant Castro's limited level of

21 education is undisputed, he was able to clearly articulate his answers to the questions posed to

22 him by detectives.  Nor is there any evidence before the court that defendant Castro suffers from

23 any diminished intellectual capacity.  Even assuming defendant Castro's age and background

24 warrant the exercise of special care, the court has scrutinized the record and concludes that the

25 totality of the circumstances support a finding that any statements defendant Castro made during

26 the early part of his December 21, 2017 interview by detectives were voluntary, with that

27 conclusion bounded by the ruling set forth below.

28 /////

1        2.      Defendant Castro's Invocation of the Right to Counsel on December 21, 2017

2        The court will now separately evaluate the second exchange between defendant Castro

3  and investigators regarding his right to counsel that took place on December 21, 2017.

4  Specifically, toward the end of the interrogation that night, defendant Castro asked the detectives

5  "how long am I going to be here? . . . Because I don't have money to pay for an attorney."  (*Id.* at

6  349.)[14]  Detective Maldonado responded, "No, if – if you don't – there it says that they give you

7  one at no cost."  (*Id.*)  Defendant Castro then responded, "Ah, well then I want one."  (*Id.*)

8  Detective Maldonado then explained "Yes, they're going to give one to you.  Already – already

9  before you go to court they're going to give you, eh, an attorney."  (*Id.* at 350.)

10        The government has properly conceded that Castro's statement to detectives on December

11  21, 2017, "Ah, well then I want one" in reference to an attorney, did constitute a clear and

12  unambiguous invocation by Castro of his right to counsel.  (Doc. No. 154 at 22, 25.)  The

13  government therefore agrees that Castro's statements to officers on December 26, 2017, after this

14  invocation of his right to counsel were obtained in violation of *Miranda*.  (Doc. No. 154 at 8.)

15  However, the government argues that the statements by plaintiff during that December 26, 2017

16  were voluntarily made and are admissible for purposes of impeachment if defendant Castro were

17  to testify at his trial.  (*Id.*)  Notably, defendant Castro does not argue that his post–invocation

18  statements either on December 21, 2017 or December 26, 2017 were involuntarily made or were

19  the product of coercion.  (*See generally* Doc. Nos. 119 at 3–15; 164 at 2–6.)

20        In light of the government's concession, the court will grant defendant's motion to

21  suppress in part and order that any statement made by defendant Castro following his invocation

22  of his right to counsel on December 21, 2017, as well as his statements made during his brief

23  interrogation on December 26, 2017, shall be suppressed and may not be introduced into evidence

24  _____

25  [14]  The court is not blind to the fact that this comment suggests that defendant Castro may not
   have *actually* fully understood the nature of his right to *appointed* counsel, even though that right
26  was twice earlier explained to him correctly in the Spanish language.  Nonetheless, at the time he
   was read his *Miranda* rights on December 21, 2017, he appeared to understand those rights, told
27  the detectives as much, and then provided cogent answers to their questions.  The relevant inquiry
   under the totality of the circumstances analysis is "whether the defendant *appeared* to understand
28  his rights."  *Garibay*, 143 F.3d at 538 (emphasis added).

during the government's case in chief during the trial of this action.  However, that order will be without prejudice to the use of those statements for purposes of impeachment on cross-examination should defendant Castro elect to testify at trial, subject to a determination that their use for that purpose is otherwise appropriate.  *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("[T]he *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted.  Despite the fact that patently voluntary statements taken in violation of *Miranda* must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination."); *Oregon v. Hass*, 420 U.S. 714, 721 (1975) ("[I]t does not follow from *Miranda* that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards.") (quoting *Harris v. New York*, 401 U.S. 222, 224 (1971)).

### D.   Motion To Suppress December 21, 2017 and December 26, 2017 Interrogation Statements Due to Unreasonable Delay in the Defendant's Initial Appearance Before a Magistrate Judge

Defendant Castro also moves to suppress his December 21, 2017 and December 26, 2017 interrogation statements on the ground that the government intentionally and unreasonably delayed his initial appearance before a U.S. Magistrate Judge for arraignment for the purpose of subjecting him to extended and repeated interrogations prior to the appointment of counsel on his behalf.  (Doc. Nos. 119 at 12–15; 166 at 3.)  In this regard, he argues that the government's conduct violated his rights under 18 U.S.C. § 3501(c), Federal Rule of Criminal Procedure 5 and the rule announced by the Supreme Court in *McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory v. United States*, 354 U.S. 449 (1957), authorizing suppression of any confession obtained during a period of unreasonable delay before appearance for purposes of arraignment and advisement of rights by the court.  The court does not find these arguments advanced by defendant Castro to be persuasive.

The Supreme Court has held that 18 U.S.C. § 3501(c) does not apply to statements made by an individual who is being held solely on state charges, as was the case with defendant Castro

1    here. *United States v. Alvarez-Sanchez*, 511 U.S. 350, 350–52 (1994). The Supreme Court

2    reasoned:

3
> Because the term delay presumes an obligation to act, there can be
4
> no "delay" in bringing a person before a federal judicial officer until
> there is some obligation to do so in the first place. Such a duty does
5
> not arise until the person is arrested or detained for a federal crime.
> Although a person arrested on a federal charge by any officer—local,
6
> state, or federal—is under "arrest or other detention" for the purposes
> of § 3501(c) and its safe harbor period, one arrested on state charges
7
> is not. This is true even if the arrest officers believe or have cause to
> believe that federal law also has been violated, because such a belief
8
> does not alter the underlying basis for the arrest and subsequent
> custody.

9    *Id.* at 350–52 (holding that § 3501(c) did not apply where a defendant was arrested on state

10   charges by local authorities on a Friday, was questioned by federal authorities the following

11   Monday, a criminal complaint was prepared that same day, and was presented to a federal

12   magistrate judge the following day). The Supreme Court in *Alvarez-Sanchez* did identify "one

13   presumably rare scenario that might present some potential for confusion; namely, the situation

14   that would arise if state or local authorities, acting in collusion with federal officers, were to arrest

15   and detain someone in order to allow the federal agents to interrogate him in violation of his right

16   to a prompt federal presentment." *Id.* at 359–60. However, there is no evidence in this case of

17   any such collusion between state and federal authorities.

18        As recounted above, defendant Castro was arrested on December 19, 2017. After his

19   second interrogation by Sheriff's detectives on December 21, 2017, he was released from the

20   Fresno County Jail because no formal state criminal charges were filed against him following his

21   arrest. (Doc. Nos. 138-10 ¶ 3; 154 at 16.) Indeed, at the time defendant Castro was released, "his

22   co-defendant, Israel Rivas-Gomez, had not yet confessed . . . ." (Doc. No. 154 at 16.) Authorities

23   didn't discover the decedent until later on the evening of December 21, 2017, after questioning

24   Rivas-Gomez. (Doc. No. 138 at 19.) FBI Agent Demmon has declared that he began preparing

25   the affidavit in support of the federal criminal complaint charging defendant Castro that night and

26   continued gathering information and drafting his affidavit throughout the day on Friday,

27   December 22, 2017, before he met with Magistrate Judge McAuliffe at approximately 5:00 p.m.

28   /////

35

1   when he swore to the affidavit and the complaint was issued.[15]  (Doc. Nos. 101-12 ¶ 3; 138-6 ¶

2   2.)  Because of the federal Christmas holiday on Monday, December 25, 2017, defendant Castro

3   was brought by federal authorities to the first available criminal calendar in this court on Tuesday,

4   afternoon, December 26, 2017, for arraignment.

5         Counsel for defendant Castro suggests that the that the delay from Thursday night

6   December 21, 2017 until Tuesday December 26, 2017 in bringing defendant Castro before a

7   Magistrate Judge of this court for arraignment suggests that federal authorities intentionally

8   delayed the initial appearance in order to subject the defendant to continued questioning without

9   the benefit of appointed counsel.[16]  (Doc. No. 166 at 3.)  That argument is based not on evidence,

10  but on speculation.  The undersigned concludes that there is no evidence of collusion between

11  state and federal authorities to delay defendant Castro's arraignment in federal court nor was

12  there any inappropriate or unreasonable delay on the part of federal authorities in seeking a

13  complaint against defendant and his appearance thereon over the Christmas holidays.  Moreover,

14  there is a total lack of evidence even suggesting that any delay that occurred as result of the

15  Christmas holiday was motivated by an improper purpose.  Accordingly, the court will deny

16  defendant Castro's motion to suppress his December 21, 2017 and December 26, 2017

17  interrogation statements premised upon the alleged unreasonable delay in his appearance before

18  this court for purposes of arraignment.

19  /////

20  /////

21

22  [15]  Agent Demmon declares that as he was working on the affidavit, he received additional
    information relevant to investigation as officers searched and canvassed the crime scene.  (Doc.
23  No 101-12 ¶ 4.)  In addition, the government represents that a U.S. Attorney's Office requires the
    authorization of the Department of Justice in Washington, D.C. to pursue violent crimes in aid of
24  racketeering charges such as those brought against defendant Castro in this case, thereby
    necessitating additional time for the affidavit and complaint to be presented.  (Doc. Nos. 101 at 29
25  (citing U.S. Dept. of Justice Manual § 9-110.801); 101-12 ¶ 3; 138-6 ¶ 2.)

26  [16]  To the extent that defendant Castro argues that he could have been brought to an initial
27  appearance in state court before December 26, 2017, the Supreme Court has rejected this
    argument, holding the "State's failure to arraign or prosecute respondent does not alter this
28  conclusion."  *Alvarez-Sanchez*, 511 U.S. at 359.

1            **V.      DEFENDANT'S REQUEST FOR EVIDENTIARY HEARING**

2            As noted at the outset, defendant Castro has also requested an evidentiary hearing in

3    connection with his motion to suppress his interrogation statements.  (Doc. No. 166.)

4    Specifically, he contends that "the vague and equivocal declarations that accompany the

5    government's opposition fail to eliminate" factual issues that must be resolved and that "there are

6    simply too many facts that would have to be ignored or deemed coincidental for the Court to rule"

7    on the pending motion to suppress without holding an evidentiary hearing.  (*Id*. at 3.)  For the

8    reasons explained above, the undersigned disagrees and determines that an evidentiary hearing is

9    neither necessary nor would aid the court in resolving the pending motion to suppress statements.

10           "An evidentiary hearing on a motion to suppress need be held only when the moving

11   papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to

12   conclude that contested issues of fact exist."  *United States v. Howell*, 231 F.3d 615, 620 (9th Cir.

13   2000) (citing *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986), *United States v.

14   Harris*, 914 F.2d 927, 933 (7th Cir. 1990), *United States v. Irwin*, 612 F.2d 1182, 1187 n.14 (9th

15   Cir. 1980), and *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972)).  "[T]o mandate an

16   evidentiary hearing, the challenger's attack must be more than conclusory and must be supported

17   by more than a desire to cross-examine."  *United States v. Marcello*, 731 F.2d 1354, 1358 (9th

18   Cir. 1984)); *see also United States v. Woodson*, No. CR 11-00531 WHA, 2011 WL 5884913, at

19   *6 (N.D. Cal. Nov. 23, 2011) (denying a defense request for an evidentiary hearing because

20   "mere refusal to accept the uncontradicted evidence does not create a material issue of fact");

21   *United States v. Walker*, 239 F. Supp. 3d 738, 739 (S.D.N.Y. 2017) ("While [an evidentiary

22   hearing] might have been warranted if there were important credibility issues that could not be

23   addressed from the paper record, the defendant has made no showing that that is the case here.").

24           In moving to suppress his interrogation statements, defendant Castro has simply failed to

25   present any facts supporting his legal arguments with "sufficient definiteness, clarity, and

26   specificity to enable the trial court to conclude that contested issues of fact exist."  *Howell*, 231

27   F.3d at 620.  Indeed, defendant Castro has not even submitted a declaration stating that he, in fact,

28   received conflicting advisements as to his right to counsel.  His counsel's after-the-fact arguments

1   suggesting that the mere existence of the unsigned Notice to Appear and Record of Deportable

2   Alien (I-213) dated December 19, 2017, suggests that the defendant was told that he had a right to

3   an attorney, but only without expense to the government, is insufficient to create a factual dispute

4   as to that point.  (See Doc. No. 119 at 4–5.)  Defendant Castro has neither presented nor proffered

5   any evidence supporting his counsel's argument that DO Jacques informed Castro that he had to

6   pay for his own attorney on December 19, 2017.  (*See generally id*.)  Those unsupported

7   arguments of counsel do not call into question DO Jacques's sworn declaration detailing the

8   relevant sequence of events.  (Doc. No. 138-8 ¶¶ 5–6.)  The court notes, in this regard, that the

9   only signed certificate of service indicates that defendant Castro received the immigration

10  advisements on December 21, 2017, *after* his first two interrogations by detectives which were

11  initiated following *Miranda* advisements.  (*See* Doc. No. 119 at 436–43.)  Further, defendant

12  Castro does not call into question the immigration docketing exhibit reflecting that as of

13  December 19, 2017 at 8:10 p.m., he had not yet been issued a "NTA" (Notice to Appear), which

14  would have contained the immigration advisements.  (Doc. No. 138-5 at 2.)  Nor has defendant

15  Castro submitted any evidence calling into doubt the ICE docket entry which reflects that he was

16  not booked into ICE custody until December 21, 2017, at 6:02 p.m.  (Doc. No. 138-5.)  Thus,

17  defendant Castro has not presented any definite, clear or specific facts establishing that a

18  contested issue of fact exists with respect to his counsel's conclusory claim of him having

19  received conflicting and confusing advisements regarding his right to counsel.  *See Howell*, 231

20  F.3d at 620; *see also Marcello*, 731 F.2d at 1358; *Woodson*, 2011 WL 5884913, at *6 (denying a

21  defense request for an evidentiary hearing because a "mere refusal to accept the uncontradicted

22  evidence does not create a material issue of fact").

23      Because defendant Castro's contention that his interrogations by law enforcement officers

24  on December 19, December 21 and December26, 2017, were tainted by an earlier immigration

25  advisement is nothing more than a conclusory argument that lacks any factual basis, his request

26  for an evidentiary hearing will be denied.

27  /////

28  /////

**CONCLUSION**

For the reasons explained above:

1.  Defendant Castro's motion for an evidentiary hearing (Doc. No. 166) is denied;

2.  Defendant Castro's motions to strike the declarations submitted by the government is denied;

3.  Defendant Castro's motion to suppress his statements made during his police interrogations (Doc. No. 119) is denied in part and granted in part with all his interrogation statements obtained following his invocation of his right to counsel during the December 21, 2017 interrogation suppressed from evidence in the government's case in chief, without prejudice to the use of those statements for purposes of impeachment on cross-examination should the defendant elect to testify at his trial and subject to a determination that their use for that purpose is otherwise appropriate and the motion to suppress statements is denied in all other respects;

4.  Defendant Castro's motion to suppress statements is also denied to the extent it seeks dismissal of the charges pending against him based on his interrogations by detectives; and

5.  The Clerk of the Court is directed to temporarily file this order under seal.  The parties are directed to meet and confer in an attempt to reach agreement on the portions of the order that should be redacted from the version that will be filed on the public docket and shall jointly (or separately if agreement cannot be reached) propose redactions within twenty-one (21) days of the date of this order.

IT IS SO ORDERED.

Dated: __August 3, 2021__                    _Dale A. Drozd_

UNITED STATES DISTRICT JUDGE